**Opinion filed February 14, 2014**



### In The

# Eleventh Court of Appeals

_____

## No. 11-13-00251-CV

_____

## IN THE INTEREST OF S.H., A CHILD

**On Appeal from the 318th District Court**

**Midland County, Texas**

**Trial Court Cause No. FM 54,743**

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order terminating the parental rights of S.H.'s mother and father. The mother appeals the termination of her rights and, in three issues on appeal, challenges the legal and factual sufficiency of the evidence to support termination. We affirm.

### *Termination Standards*

The termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2013). To determine if the evidence is legally sufficient in a parental termination case, we

review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). To terminate parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(1)(A)–(T) and that termination is in the best interest of the child. FAM. § 161.001.

*Trial Court's Findings*

In this case, the trial court found that the mother had committed three of the acts listed in Section 161.001(1): those found in subsections (D), (E), and (O). The trial court's findings under the respective subsections were that the mother had placed or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being, that the mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being, and that the mother had failed to comply with the necessary provisions of a court order.

*Evidence at Trial*

The record shows that S.H. was removed from her parents' care when she was approximately one and one-half years old; she was over two and one-half years old at the time of trial. The removal was based upon allegations that the mother was living from hotel to hotel, using drugs (bath salts and MDPV), and leaving S.H. unattended for long periods of time without properly caring for her. There were also allegations that S.H. had an "adult-sized bite mark," pinch marks, and bruising.

S.H.'s father testified that he had his sister call the Department "to keep [his] child from the environment that she was in" and to "save [her] from that stuff." At that time, S.H. lived with her mother. The mother was using drugs and had nowhere to stay. The father involved the Department after he saw the mother and S.H. at the mall. He said that the mother "weighed maybe 75 pounds soaking wet" and "looked like a dead person walking" and that S.H. had pinkeye in both eyes. The mother's appearance suggested heavy stimulant use, such as bath salts, methamphetamine, cocaine, or amphetamine. The father testified that he had previously used drugs, including marihuana, methamphetamine, and cocaine, with the mother. According to the father, the mother's mother and an uncle were manufacturing methamphetamine in a house where the mother was living.

At the time of trial, the mother and the father had resumed their relationship. The father testified that, for the past month and a half, the mother had been doing well. The father thought the mother deserved another chance because she "is an awesome mom when she's sober." The father admitted, however, that the mother was mean, vindictive, rude, and heartless when on drugs. S.H. had been placed in the home of a paternal cousin, Leslie. The father testified that Leslie and her husband are good people; that they love S.H.; and that they will take care of S.H., be protective of S.H., and give her a good life.

The Department's caseworker, Nuri Martinez, testified that the mother had signed a service plan and that the mother understood she needed to complete all services and comply with any additional orders of the trial court. The mother's family service plan, the trial court's orders that incorporated that service plan, and an order that modified the service plan were admitted into evidence. The modification required the mother to obtain a second drug and alcohol assessment after she admitted to Detective Robby Mobley that she had been using bath salts. The mother did not complete the second assessment. Martinez testified regarding

several of the mother's failures to comply as ordered. The mother inconsistently maintained contact with the Department; failed to notify the Department when she moved into a different residence; failed to obtain stable, appropriate housing; continued to live with people, including her mother, who had criminal records and were involved with drug trafficking; failed to maintain stable employment; misinformed the Department and the trial court regarding her employment status; was either late or missed many of the scheduled visitations with S.H.; failed to complete the required counseling; and failed to show up several times to take a drug test (however, when she did show up and test, the results were negative). When the mother was evicted from one of the houses in which she lived while this case was pending, the realtor found several propane torches, a lot of squares of foil all over the house, a small digital scale, and a whole box of cheap "throwaway" phones. Due to drug-related safety concerns, the Department would not permit Martinez to make a home visit at the residence where the mother lived at the time of trial.

Detective Mobley testified that S.H.'s maternal grandmother had been convicted in the federal system for a crime involving the manufacture and delivery of methamphetamine. He also testified that S.H.'s mother was living with the grandmother at the time of the offense. At the time of trial, S.H.'s mother was being "looked at" in a bath salt investigation. During the investigation, Detective Mobley talked to the mother, who appeared to be "high" that day; the mother admitted that she had used bath salts recently. Detective Mobley testified that indications of drug activity were located in the home where the mother and the grandmother lived.

Leslie, the paternal cousin with whom S.H. had been placed, testified that S.H. had lived in her home for almost nine months and that S.H.'s behavior had improved during that time. According to Leslie, S.H. "was like a wild animal"

4

when she arrived. She was cute and wonderful and loving one moment, and the next moment she was "clawing, scratching, fighting, biting to get away." S.H. hoarded food and was very possessive. Leslie testified about her concerns with S.H.'s sexual behavior. Leslie testified that S.H. "would take off her pajama pants and she would wad them up and stuff them up under her diaper and she would just be in [her bed] humping, humping, humping. She would do her blanket, she would do toys, stuffed animals, her sippy cup." When Leslie began to potty train S.H., she observed S.H. touch herself and say, "No, No, No. It hurts you. It hurts you." S.H. had an abnormal fear of people—especially males—that were attempting to change her diaper or pull-up. Leslie stated that she would be concerned for S.H.'s safety if S.H. were returned to either parent. Leslie and her husband would like to adopt S.H. and raise her as their own.

S.H. was referred to a counselor because of her inappropriate sexual behavior. Both sets of caregivers with whom S.H. had been placed after removal reported that S.H. exhibited unusual "humping behaviors." S.H. had been "taking blankets and bottles and dolls, rolling them up and masturbating with them. She was rubbing them between her legs against her clitoris." Donna Carrasco, a licensed professional counselor, testified that S.H. was very young to be displaying such "[e]xtremely abnormal" behaviors. Carrasco testified that, typically, when a child as young as S.H. exhibits such behaviors, it is because the child has been sexually abused. During the two counseling sessions that Carrasco had with S.H., S.H. did not act out sexually but did exhibit one concerning behavior: she grabbed a small brown baggie; said, "[O]h, that's scary, that's scary"; and threw the baggie. S.H. hid the baggie in a box with a blanket and a doll on top.

Carrasco noticed that S.H. had bonded with the parents in her current placement. S.H. appeared to Carrasco to be happy and healthy. Both Carrasco and Martinez praised S.H.'s current placement. According to Martinez, S.H. is bonded

with the placement family, and they are protective of her and want to adopt her. They have an appropriate home and have been persistent in getting counseling for S.H.'s unusual sexual behavior. Martinez stated that termination of both parents' rights would be in the best interest of S.H. and that it would not be in S.H.'s best interest to return to her mother.

The child's court-appointed special advocate, Judy Davis, also testified that S.H. seems to be very loved and to feel very secure in her current placement. S.H. is part of the family, is bonded to her placement family, and has a very good environment with that family. Davis believed that it would be in S.H.'s best interest for the trial court to terminate the parental rights of both parents and to allow S.H. to remain with the placement family. Davis testified that S.H. would be in physical or emotional danger if she were returned to either parent.

*Acts of the Mother*

The Department produced clear and convincing evidence from which the trial court could reasonably have formed a firm belief that the mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of S.H. The evidence showed that the mother was ordered to complete services but that the mother failed to complete her services or comply with the trial court's orders. Section 161.001(1)(O) does not "make a provision for excuses" for a parent's failure to comply with the family service plan. *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.). The evidence also showed that S.H. had been in the Department's care for at least nine months and that S.H. had been removed from the mother due to abuse or neglect. Thus, we hold that the evidence is legally and factually sufficient to support the trial court's finding under Section 161.001(1)(O). *See id.* The mother's second issue on appeal is overruled.

Because a finding that a parent committed one of the acts listed in Section 161.001(1)(A)–(T) is all that is required under that statute, we need not address the mother's first issue in which she challenges the sufficiency of the evidence to support the trial court's findings under Section 161.001(1)(D) and (E). *See* TEX. R. APP. P. 47.1.

*Best Interest of the Child*

In the mother's third issue, she argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in S.H.'s best interest. With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

We hold that, based on the evidence presented at trial and the *Holley* factors, the trial court could reasonably have formed a firm belief or conviction that termination of the mother's parental rights would be in the best interest of S.H. *See Holley*, 544 S.W.2d at 371–72. Upon considering the record as it relates to the

child's relationships with the mother and the placement family, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the mother and of the placement family, the stability of the current placement, the programs available to assist the family, the plans for the child by the Department, the mother's continued involvement with drug activity, the mother's erratic behavior, the safety concerns with the mother's housing situation, the failure of the mother to obtain stable employment, and the mother's failure to complete her court-ordered services, we hold that the evidence is both legally and factually sufficient to support the finding that termination of the mother's parental rights is in the best interest of S.H. *See id.* The trial court's finding as to best interest is supported by clear and convincing evidence. The mother's third issue is overruled.

*This Court's Ruling*

We affirm the trial court's order of termination.

MIKE WILLSON

JUSTICE


February 14, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.